IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KEITH C. BACHTELL and RENEE D. BACHTELL, as Administrators of the Estate of Jamison Taylor Bachtell, dec'd and in their own right,** : | **Civil No. 1:18-cv-02292** |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| **GENERAL MILLS, INC. and SIGNATURE BRANDS LLC,** : | |
| : | |
| **Defendants/ Third Party Plaintiffs.** : | |
| : | |
| **v.** : | |
| **FLAIR FLEXIBLE PACKAGING CORPORATION and MANTO INTERNATIONAL LIMITED** : | |
| : | |
| **Third-Party Defendants** : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

Currently before the court is third-party Defendant Flair Flexible Packaging Corporation's ("Flair") partial motion to dismiss (Doc. 24) third-party Plaintiff Signature Brands, LLC's ("Signature") indemnity claim against Flair. Flair also requests that paragraph nineteen of Signature's amended third-party complaint be struck. The court will grant in part and deny in part the motion.

# I. **Background**

On November 29, 2018, Plaintiffs Keith C. Bachtell and Renee D. Bachtell (collectively, "Plaintiffs") initiated this lawsuit by filing a complaint against Defendants General Mills, Inc. and Signature (collectively, "Defendants") stemming from an accident where their son died after choking on the cap of a Betty Crocker icing dispenser. (Doc. 1 [the "Underlying Complaint"].) Plaintiffs allege that Defendants, *inter alia*, improperly designed the Betty Crocker icing package and cap and failed to warn Plaintiffs of the dangers of choking on the cap. They assert negligent infliction of emotional distress, wrongful death, survival, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, failure to warn, and products liability claims.[1]

About twelve weeks after Plaintiffs filed suit, Signature filed a third-party complaint against Third-Party Defendants Flair and Manto International Limited. (Doc. 16.) On February 27, 2019, Signature amended the third-party complaint. (Doc. 19 [the "Third-Party Complaint"].)[2]

---

[1]    Flair has grouped these claims into three categories: (1) the wrongful death, survival, and negligent infliction of emotional distress claims into negligence; (2) the products liability and failure to warn claims as strict liability; and (3) the breach of express warranty, breach of implied warranty of fitness for a particular purpose, and breach of implied warranty of merchantability into breach of warranty claims. (*See* Doc. 24, p.12.) Signature appears to treat these claims similarly. (*See* Doc. 19, ¶ 9.) As such, the court shall adopt this grouping for the purposes of this opinion.

[2]    The court shall simply refer to the amended complaint because "[a]n amended complaint supersedes the original version." *Kopko v. Lehigh Valley Network*, --- Fed. Appx. ----, 2019 WL

The Third-Party Complaint alleges, *inter alia*, that Flair designed, manufactured, and supplied "the icing pouch that is the subject of this action." (Doc. 19, ¶ 17.)  On this basis, Signature has brought common law indemnification and contribution claims against Flair.  Paragraph nineteen of the Third-Party Complaint—under the heading for Signature's common law indemnification claim—states:

> In the event Plaintiffs receive by verdict, settlement or otherwise, any payment related to this matter, Flair is, pursuant to common law, jointly and severally liable with Signature Brands and/or liable over to Signature Brands by way of indemnification.

(Doc. 19, at ¶ 19.)

On March 20, 2019, Flair filed the instant motion pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Signature's indemnification claim failed as a matter of law for four reasons: (1) Pennsylvania's common law indemnification doctrine only permits recovery by a defendant who was "secondarily" liable, by operation of law, for a third party whose actual conduct rendered them "primarily" liable; (2) Plaintiffs' negligence claims against Signature are not subject to indemnification because proof of the underlying negligence claim against Signature would require a finding that Signature had engaged in conduct rendering it primarily

2484473, at *4 (3d Cir. June 14, 2019) (internal brackets omitted) (quoting *Snyder v. Pascack Valley Hosp.*, 303 F.3d 271, 276 (3d Cir. 2002)).

liable; (3) Plaintiffs' strict liability claims against Signature are not subject to indemnification because Signature actively participated in the tortious conduct at issue by assembling the icing product that was ultimately sold to Plaintiffs; and (4) breach of warranty claims are, as a matter of law, insusceptible to indemnification. (*See* Doc. 24.)  Flair further argued paragraph nineteen of the Third-Party Complaint should be struck because an indemnitor cannot be held jointly and severally liable with an indemnitee.  (*See id.*)

Signature responded by arguing: (1) in a "chain of distribution" case, the question of primary and secondary liability is a fact-intensive inquiry; (2) sellers and assemblers can be entitled to indemnification from a manufacturer in a products liability case, even where they failed to discover a defect; and (3) that, even if the negligence claims are insusceptible to indemnification, "negligence is not the only basis of Plaintiffs' claims against Signature Brands." (Doc. 25, pp. 9-10.)  Signature also argues paragraph nineteen should not be struck because it merely "state[s] an element of Signature Brand's claim for contribution" against Flair.  (*Id.* at 12.)

In its reply brief, Flair argues, *inter alia*, that: (1) Signature has conceded it is not entitled to indemnification for any underlying negligence claims; and (2) Signature's admission that it assembled, marketed, distributed, and sold the icing tube and cap at issue means it "can only be found strictly liable as a primarily liable

party." (Doc. 26, p. 4.) The parties, having completed briefing, this issue is now ripe for the court to resolve.

## II.    <u>Standard of review</u>

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "When reviewing a 12(b)(6) motion, we 'accept as true all well-pled factual allegations in the complaint and all reasonable inferences that can be drawn from them.'" *Estate of Ginzburg by Ermey v. Electrolux Home Prods., Inc.*, 2019 WL 4187372, at *3 (3d Cir. Sept. 4, 2019) (quoting *Taksir v. Vanguard Grp.*, 903 F.3d 95, 96-97 (3d Cir. 2018)). The facts alleged must be "construed in the light most favorable to the plaintiff." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (internal quotations, brackets, and ellipses omitted). The universe of facts upon which the court may rely includes those facts alleged in the complaint, facts which the court may take judicial notice of, and indisputably authentic documents referred to in the plaintiff's complaint. *Hartig Drug Co., Inc. v. Senju Pharm Co.*, 836 F.3d 261, 268 (3d Cir. 2016).

The Third Circuit has detailed a three-step process to determine whether a complaint meets the pleading standard. *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2014).

First, the court outlines the elements a plaintiff must plead to state a claim for relief. *Id*. at 365. Second, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id*. Third, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. Finally, the traditional 12(b)(6) standards articulated in *Twombly* and *Iqbal* "apply with equal force to third-party complaints." *Musto v. Office Depot, Inc.*, No. 3:18-CV-02427, 2019 WL 2994230, at *2 (M.D. Pa. July 9, 2019) (internal quotations and ellipses omitted).

## III. Discussion

### A. Pennsylvania's common law indemnity doctrine

Common law indemnity is a legal mechanism, "aris[ing] by operation of law," whereby a defendant can completely shift—as opposed to partially shift—payment of a claim to a third-party defendant. *Huffsmith v. PPL Elec. Utilities Corp.*, No. 11-CV-1012, 2019 WL 4274338, at *6 (Lackawanna Cty. Ct. Com. Pl. Sept. 5, 2019) (citing *City of Wilkes-Barre v. Kaminski Bros., Inc.*, 804 A.2d 89, 92 (Pa. Commw. Ct. 2002), *app. denied*, 828 A.2d 351 (Pa. 2003)). The doctrine is an equitable remedy "recognized in cases where community opinion would consider that in

justice the responsibility should rest upon one defendant rather than the other." *Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 622 (Pa. Super. Ct. 1983) (internal brackets omitted) (quoting W. Prosser, *Law of Torts* 313 (4th ed. 1971)). It arises only when the third-party defendant engaged in the tortious conduct at issue, but the third-party plaintiff was liable for the other's conduct as a matter of law. *Kaminski Bros., Inc.*, 804 A.2d at 92. "The classic example of such a legal relationship is that of principal and agent, employer and employee." *Id.* at 92 n.4 (citing *Restatement (Second) of Torts* § 886B (1979)). In distinguishing between the party whose conduct actually gave rise to liability and the party who is only legally liable, the former is referred to as the "primary" or "active" tortfeasor, while the latter is referred to as the "secondary" or "passive" tortfeasor. *Kaminski Bros., Inc.*, 804 A.2d at 92.

In *Builders Supply Company v. McCabe*, the plaintiff ("Builders") was a company whose driver was forced from the road by the defendant, McCabe, and crashed into another vehicle driven by a man named Pietropaolo. 77 A.2d 368, 369-70 (Pa. 1951). Pietropaolo sued Builders in Ohio and acquired a three thousand dollar judgment against it. *Id.* Builders then sued McCabe in Pennsylvania for common law indemnification, alleging that McCabe's negligent conduct caused Builders' driver to crash, rendering him liable for the previous lawsuit and judgment. *Id.* The jury rendered a verdict in favor of Builders, but the Pennsylvania Supreme

Court reversed, explaining that the trial court had misconstrued the right to indemnity. *Id.*

The *McCabe* court explained that Builders' claim was one properly sounding in contribution, whereby a party seeks to *share* blame with a joint tortfeasor. *See id.* at 326-28. A contribution claim is distinct from an indemnity claim in that two parties who have both committed wrongs may share some blame through contribution, but a party seeking indemnity is one who is held liable as a matter of law for another party having committed the actual, underlying tortious conduct giving rise to the plaintiff's claim:

> [T]he important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.

*Id.* at 328.

Because the Ohio jury had found Builders negligent in causing the accident, it axiomatically found Builders had itself engaged in conduct rendering it liable. *Id.* at 329. Put otherwise, Builders was entitled to argue, in its defense, that by being forced from the road by McCabe, Builders did not cause the wreck with Pietropaolo due to any negligence on its own; it had driven reasonably in light of a dangerous situation created by an absent third party. *See id.* However, because Builders had

failed to succeed on this theory previously, it was not entitled to relitigate this claim through an indemnification proceeding.

One way to think of indemnification is considering whether the indemnitee properly delegated one of its legal responsibilities to a party whose failure to carry out that duty resulted in the plaintiff's injury. For example, a municipality may delegate the authority to maintain a public walkway to a nearby property owner. *See id.* at 326. Should a pedestrian suffer injury due to the walkway conditions being poor, the municipality and property owner would both be liable, as a matter of law, but the municipality could seek indemnification from the property owner. *See id.* A party is not entitled to indemnification if it attempts to transfer a nondelegable duty. *See Kaminski Bros., Inc.*, 804 A.2d at 93 ("Where a landowner employs an independent contractor to do construction, there is authority for the view that the landowner's duty of care is not delegable and that the landowner and the contractor both have liability exposure.").

### B. Indemnification turns on the nature of the claims the third-party plaintiff seeks to have indemnified.

A "third-party claim itself must be grounded specifically within the 'claim' originally brought against the defendant." *Kroger Co. v. New Enters. Stone & Lime Co.*, No. 17-cv-01541, 2018 WL 4615955, at *3 (quoting *Pansini v. Trane Co.*, No. 17-3948, 2018 WL 2129453, at *2 (E.D. Pa. May 9, 2018)). Thus, before applying

the law governing indemnity, the court will first address three factual disputes governing the claims and allegations at issue here.

First, Flair asserts as true certain facts "which are not contradicted by any facts alleged in the complaint or amended third-party complaint." (Doc. 24, at ¶ 8.) But Flair is not permitted to raise new facts in its brief simply because they "are not contradicted by" facts pleaded. (*Id.*) The court will thus not consider them. Second, Flair suggests the court can infer from the Underlying Complaint that the tubing itself did not cause Plaintiffs' injury, and thus Flair cannot be liable for supplying the tube that was ultimately placed in the Betty Crocker icing dispenser at issue here. (*See generally*, Doc. 24.) Flair's point has some logical appeal, considering Plaintiffs' son choked on the cap, not the icing package itself. But, even if this was a reasonable inference from the allegations, the court must nonetheless deny the motion if other reasonable inferences can be made in favor of Signature. Here, Plaintiffs have extensively pleaded that the way in which the icing packaging and cap were designed and manufactured *both* contributed to their son's injury. Thus, Flair's argument is better reserved for summary judgment or trial than at the motion to dismiss stage. Third, Flair argues that Plaintiffs have alleged Signature engaged in actively tortious conduct, thus barring Signature from seeking indemnification. (*Id.*) Flair is correct Plaintiffs have alleged Signature itself designed and manufactured the packaging at issue here. But Signature has alleged Flair actually

carried out those duties. It can thus, at the pleading stage, seek indemnification from Flair for designing and manufacturing the packaging.

With this factual basis in mind, the court now discusses which of Plaintiffs' causes of action are subject to indemnity.

### C. <u>The court will dismiss indemnification for the negligence claims.</u>

Signature admits the negligence claims are not subject to indemnification, because they would require an underlying jury to find that Signature was an active tortfeasor. (*See* Doc. 25, p.10 (arguing the negligence claims likely are not subject to indemnification, but that other of Plaintiffs' claims may be subject to indemnification).) Thus, the court will dismiss the indemnification claim regarding Plaintiffs' claims sounding in negligence, which include negligent infliction of emotional distress, wrongful death, and survival. *See EQT Prod. Co. v. Terra Servs., LLC*, 179 F. Supp. 3d 486, 494-95 (W.D. Pa. 2016) (granting motion to dismiss common law indemnity claim based on underlying negligence claim).

Signature is nonetheless permitted, at trial, to argue that it reasonably relied upon Flair's work and thus was not negligent in its decision to market, assemble, and sell the Betty Crocker icing packaging at issue here. Such arguments will simply operate as a defense against liability, instead of a mechanism for forcing Flair to pay for any judgment rendered against Signature. *See, e.g., id.* at 497-98 ("[I]f Terra can prove at trial that the fault for the holes in the liner lies with Trumbull, it will provide

Terra a defense from liability to EQT."); *cf. McCabe*, 77 A.2d at 372 (implying Builders could have argued, in its original negligence trial, that it was not negligent because it reacted reasonably to the third party's erratic driving).

### D. __The court will grant the motion regarding the express warranty claim but deny the motion regarding the implied warranty claims.__

Plaintiffs have pleaded three breach of warranty claims: breach of express warranty, breach of the warranty of merchantability, and breach of the warranty of fitness for a particular purpose. (Doc. 1, ¶¶ 70-72.) The court will address each in turn.

"[B]oth common law indemnity and contribution claims must be grounded in tortious conduct." *Terra Servs., LLC*, 179 F. Supp. 3d at 495. As such, indemnification is not available "*when the third party plaintiff's liability is based on a breached contract*." *Pansini*, 2018 WL 2129453 at *8 (emphasis in original) (quoting *E. Elec. Corp. of N.J. v. Rumsey Elec. Co.*, No. 08-CV-5478, 2010 WL 2788294, at *2 (E.D. Pa. July 14, 2010)). Thus, whether a party can seek indemnification for a breach of warranty claim turns on whether the claim sounds in tort or contract under Pennsylvania law.

In *Bruno v. Erie Insurance Company*, the Pennsylvania Supreme Court laid out the framework for distinguishing between a claim sounding in tort or contract, stating "the nature of the duty alleged to have been breached . . . [is] the critical determinative factor in determining whether the claim is truly one in tort, or for

12

breach of contract." 106 A.3d 48, 68 (Pa. 2014). If the "duty breached is one created by the parties by the terms of their contract—i.e., a **_specific_** promise to do something . . . then the claim is to be viewed as one for breach of contract." *Id.* (emphasis supplied). "If, however . . . the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts . . . then it must be regarded as a tort." *Id.* "[T]he mere existence of a contract between two parties does not, *ipso facto*, classify a claim . . . as one for breach of contract." *Id.* at 69. As such, "the Pennsylvania Supreme Court has found even a breach of warranty claim can sound in tort." *Indalex, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 83 A.3d 418, 426 n.4 (Pa. Super. Ct. 2013) (citing *Williams v. W. Penn Power Co.*, 467 A.2d 811, 816 (Pa. 1983)).[3] Indeed, in the duty-to-defend context, the United States Court of Appeals for the Third Circuit has held that "[u]nder Pennsylvania law, breach of warranty claims have been held to sound in tort." *Berg Chilling Sys. Inc. v. Hull Corp.*, 70 Fed. App'x 620, 624 (3d Cir. 2003).

Nonetheless, the court has not located a Pennsylvania Supreme Court, Pennsylvania intermediate appellate court, or Third Circuit case squarely addressing whether, for indemnity purposes, a claim for breach of warranty sounds in tort or

---

[3]    *Williams* ultimately held that, for statute of limitations purposes, it does not matter whether breach of warranty claims sound in tort or contract because the UCC's four-year statute of limitations should govern them.

contract.[4]  In attempting to resolve the matter, two different judges in the Eastern District of Pennsylvania have held that, for indemnification purposes, breach of warranty claims are closer to breach of contract than tort claims and are thus not subject to common law indemnification.  *See Pansini*, 2018 WL 2129453 at *8 (Pratter, J.); *Kroger Co.*, 2018 WL 4615955 at *4 (Rufe, J.).  The analysis of both of these cases, however, applies with maximal force to breach of *express* warranty claims.  *See Pansini*, 2018 WL 2129453 at *1 (evaluating plaintiff bringing breach of contract and breach of warranty claims, but not negligence claims, together); *Kroger Co.*, 2018 WL 4615955 at *1 (evaluating plaintiff bringing breach of warranty claim in connection with allegations that pavement did not comply with "specified requirements").  An express warranty is logically similar to a contract, in that one party expressly promised to perform for another party and failed in that regard.  *Cf.* BLACK'S LAW DICTIONARY 1903 (11th ed. 2019) (defining an express warranty as a "warranty created by the overt words or actions of the seller," and

---

[4]     Under the *Erie* doctrine, a federal court applying state substantive law "should apply the state law as pronounced by the highest court of the state. . . . However, when the highest court of the state has not addressed an issue, a federal court must predict how the highest state court would resolve the issue," such as by looking "'to the opinion of an intermediate appellate court.'"  *Giehl v. Terex Utilities*, No. 3:12-0083, 2012 WL 1183719, at *8 (M.D. Pa. Apr. 9, 2012) (quoting *Aetna Cas. & Sur. Co. v. Farrell*, 855 F.2d 146, 148-49 (3d Cir. 1988)).  If no state supreme or appellate court has resolved the issue, the court must "look to analogous state court cases . . . [and] scholarly treatises . . . 'with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince.'"  *Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010) (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662-63 (3d Cir. 1980)).  "Once the Third Circuit predicts how the state's highest court would resolve an issue, district courts are bound by this prediction," unless a subsequent decision by the state court suggests otherwise.  *Giehl*, 2012 WL 1183719 at *8.

explaining that an "'*express* warranty arises from the contract itself'") (emphasis in original) (quoting 1 Julian B. McDonnell & Elizabeth J. Coleman, *Commercial and Consumer Warranties* ¶ 1.02[1], at 1-7 (1991)); *see also Dyvex Indus., Inc. v. Agilex Flavors & Fragrances, Inc.*, No. 12-CV-0979, 2018 WL 1428233, at *6 (M.D. Pa. Mar. 22, 2018) (explaining that express warranties are created by the parties negotiating particular contents of a contract).

Implied warranties are different. They are obligations "arising by operation of law because of the circumstances of a sale, rather than by the seller's express promise." BLACK'S LAW DICTIONARY 1903 (11th ed. 2019); *accord Goodman v. PPG Indus., Inc.*, 849 A.2d 1239, 1245 (Pa. Super. Ct. 2004), *aff'd*, 885 A.2d 982 (Pa. 2005) ("[I]mplied warranties are implied by law . . . In contrast, as noted above, express warranties are bargained, 'dickered,' individualized promises that the goods will perform up to the specific standards set forth in that warranty.") (quoting 13 Pa. C.S. § 2313, Cmt. 1); *Dyvex Indus., Inc.*, 2018 WL 1428233 at *6 ("'Express warranties, *as distinguished from implied warranties*, do not arise by operation of state law.'") (emphasis supplied) (quoting *Bentzley v. Medtronic, Inc.*, 827 F. Supp. 2d 443, 454 (E.D. Pa. 2011)). Indeed, both the implied warranties of fitness and merchantability arise by operation of law, not by express terms in an agreement. *See* BLACK'S LAW DICTIONARY 1903-04 (11th ed. 2019).

"While there is no Pennsylvania appellate decision on whether a claim for breach of implied warranty sounds in tort," at least two decisions by the Pennsylvania Courts of Common Pleas have held breach of implied warranty actions sound in tort and are thus subject to contribution claims. *See Greiner v. Erie Ins. Exch.*, 57 Pa. D. & C. 4th 213, 2001 WL 1807642, at *5 (Phil. Cty. Ct. Com. Pl. June 26, 2001) (holding "a claim for breach of implied warranty was an action in tort on which a claim for contribution could be premised"); *Woolf v. Dinbokowitz Marine, Inc.*, 22 Pa. D. & C. 545, 1993 WL 786940, at *3 (Lehigh Cty. Ct. Com. Pl. July 8, 1993) ("[A] claim for contribution may be made under a breach of implied warranty theory."). *Greinier* also relies on extensive out-of-state decisions which all held that "a defendant liable for breach of implied warranty is liable in tort for purposes of contribution." 2001 WL 1807642 at *6 (collecting cases).

Relying upon similar principles to those articulated by *Goodman*, one out-of-state case has explicitly held that breach of implied warranty claims should be viewed as sounding in tort for the purposes of common law indemnification:

> An implied warranty is not literally a "contractual" warranty because it is not incorporated into the formal agreement of the parties and is not a basis of the bargain. The implied warranty arises independent of the sales contract. Furthermore, an action for breach of implied warranty is based on concepts of duty created by the sale of a product, breach of duty, proximate causation and injury. Defenses that may be asserted include contributory negligence and assumption of the risk. Thus, analysis of an indemnity claim based on an implied

> warranty is more akin to the area of tort law than to
> contract law.

*Richardson v. Clayton & Lambert Mfg. Co.*, 634 F. Supp. 1480, 1483 (N.D. Miss. 1986) (internal citations omitted); *accord Adkinson v. Int'l Harvester Co.*, 975 F.2d 208, 212 n.6 (5th Cir. 1992) (citing *Richardson* for the proposition that an "indemnity claim based on an implied warranty is more akin to the area of tort law than to contract law").

The Pennsylvania statute governing the implied warranty of merchantability suggests the warranty arises from the contract between the parties. *See* 13 Pa. C.S. § 2314(a) ("[A] warranty that the goods shall be merchantable is implied in a contract."). But, in context, it is clear that this warranty does not emerge from the negotiated terms of the contract, just the business relationship between the parties, rendering it closer to a tort than contract-based claim. *See Tihansky v. Edizone, LLC*, No. 17-5392, 2019 WL 3037184, at *4 (E.D. Pa. July 10, 2019) ("The implied warranties are premised upon the Parties' relationship—Defendant, the manufacturer or seller and Plaintiff, the purchaser.") (citing 13 Pa. C.S. § 2314(a)); *Cyr v. United Airlines, Inc.*, No. 18-04323, 2019 WL 936648, at *4 (E.D. Pa. Feb. 25, 2019) (holding a breach of warranty claim sounded in tort because "[a]lthough Cyr's suit only arose because of his contract with United . . . [t]he parties' contract merely served as the vehicle which established a relationship between them."). This conclusion is further supported by the fact that, "for breach of implied warranties, a

party need not prove 'privity of contract.'" *Moscatiello v. Pittsburgh Contractors Equip. Co.*, 595 A.2d 1198, 1203-04 (Pa. Super. Ct. 1991). This renders the statute consistent with common law indemnification principles.

Viewing these authorities together, the Pennsylvania Supreme Court would likely conclude that, in the context of indemnification, implied warranties are covered because they sound in tort while express warranties are not covered because they sound in contract. As such, Signature is permitted to seek indemnification for the implied warranty claims but is barred from seeking indemnification for the express warranty claim.

**E. <u>The court will deny the motion to dismiss regarding indemnification for the strict liability claims</u>.**

Here, Signature argues that, as a mere seller of a defective product, it is entitled to seek indemnification from Flair as the manufacturer. (Doc. 25, pp. 9-10.) Signature is correct that a mere seller may seek indemnification from a manufacturer in a products liability case. *Moscatiello*, 595 A.2d at 1201 ("[W]e have utilized the 'mere conduit' theory to entitle mere sellers of products that injure consumers to indemnity from the manufacturer of the product on the grounds that the relative culpability of the seller pales in comparison to that of the manufacturer."); *see Walasavage v. Marinelli*, 483 A.2d 509, 518 (Pa. Super. Ct. 1984) (mere seller of a defective truck was entitled to indemnification from car manufacturer). But that is merely "the *general* rule in Pennsylvania," rendering it "applicable only in certain

18

circumstances." *Moran ex rel. Moran v. G & W.H. Corson, Inc.*, 586 A.2d 416, 427 (Pa. Super. Ct. 1991) (emphasis in original). Flair correctly points out that Signature is not a mere seller because it admits it assembled the product. Thus, the court now turns to Pennsylvania case law governing the conditions under which an assembler of a product may seek indemnification from a manufacturer who constructed a defective component.

In *Burbage v. Boiler Engineering & Supply Company*, a boiler seller sought indemnification from a valve manufacturer because a defective valve installed in the boiler caused the death of a boiler purchaser. 249 A.2d 563, 565-66 (Pa. 1969). The Pennsylvania Supreme Court found the boiler seller was entitled to indemnification, looking to one key fact: the seller did not alter the valve in any way after it was produced. *Id.* ("In view of the fact that the jury found no substantial change in the valve since manufacture and since it was to be merely incorporated into a larger product, we see no reason why liability should not carry through to the valve manufacturer, General, as the manufacturer of a defective component part."). Thus, one factor courts must consider in evaluating the liability of an assembler is the degree of alterations the assembler made to the component, and whether these alterations were attributable to the injury suffered. *See id.*; *see also Burch*, 467 A.2d at 623 n.5 (explaining, based on a survey of out-of-state cases, an assembler can be

compelled to indemnify others in the supply chain "[f]or defective designs attributable solely to the assembler").

In *Burch v. Sears, Roebuck & Company*, a man sued Sears for selling him a lawnmower with a defective switch that caused him to lose most of his hand. 467 A.2d at 618. Sears, in turn, sued General Electric—the lawnmower manufacturer— for indemnification. *Id.* After a jury trial, the trial court granted complete indemnification to Sears. *Id.* On appeal, the Pennsylvania Superior Court summarized the relationship between strict product liability and indemnification law:

> Under our products liability law, all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, ***assemblers***, owners, sellers, lessors, ***or any other relevant category***, are potentially liable to the ultimate user injured by the defect. This rule of law ensures the availability of compensation to the injured party, and helps place the burden of such injury on parties who, unlike the consumer, have a better opportunity to control the defect or spread its costs through pricing. To further achieve these policies and to do justice among the potential defendants, Pennsylvania permits the remedies of indemnity and contribution so that as among those in the chain of distribution liability may ultimately rest with, or be shared equally among, those who can best detect, control, or prevent the defect.

*Id.* at 621-22 (internal citations omitted) (emphasis supplied). Put otherwise, while an assembler and manufacturer may both be legally liable to the consumer, contribution and indemnification exist specifically to determine whose conduct truly

caused the underlying injury. Thus, the mere fact that a seller assembled the product at issue is insufficient to negate one's right to indemnification.

Expanding on *McCabe*, the *Burch* court explained that strict product liability cases require fact-intensive analysis to properly allocate responsibility, taking into account multiple factors including which party bore the "opportunity to discover or actual knowledge of the defective condition . . . the relative burdens of correcting or preventing the defect . . . trade custom, relative experience, and practicality." *Id.* at 622-23 & n.5. Applying these factors to the case before it, the *Burch* court made significant weight of two facts: (1) "no evidence indicated that Sears directly controlled the design or had available the expertise to evaluate its safety;" and (2) the jury found that "Sears, justifiably relying on its suppliers, was only secondarily liable." *Id.* at 624. While noting that Sears attached its name to the lawnmower, likely causing some buyers to purchase it in reliance on Sears's reputation, the court found that the jury reasonable concluded that GE was primarily liable for creating the dangerous condition. *See id.* Thus, when a seller is more than a mere seller— and engaged in some conduct contributing to the sale of a defective product—it is likely a matter of fact best reserved for a jury whether that seller's conduct actually contributed to the injury at issue.

In *Walton v. Avco Corporation*, Glenda Walton sued Avco Corporation for strict product liability on behalf of the estate of a man and wife who died in a

helicopter crash.  610 A.2d 454, 456 (Pa. 1992).  Her claim against Avco stemmed from the helicopter crashing due to an oil pump—manufactured by Avco but incorporated into the helicopter and ultimately sold to the consumer by Hughes Helicopter, Inc.—failing mid-flight.  *Id.*  Avco filed a cross-claim for indemnification and contribution against Hughes based on Avco having informed Hughes, over a year before the accident, of the specific design flaw that caused the crash.  *Id.* at 457.  The jury ultimately found Hughes and Avco jointly liable for failure to warn, but awarded Avco partial contribution from Hughes.  *Id.*  The judge denied any right to indemnification because the jury had found both parties partly responsible.  *Id.*

On appeal, the Pennsylvania Supreme Court began by explaining the origins of strict liability in tort, describing how the economics behind businesses introducing defective products into the stream of commerce justified holding businesses liable—absent any showing of negligence by the plaintiff—for harms suffered due to the defect.  *See id.* at 458-59.  In addressing why Hughes was subject to liability, despite Avco having manufactured the oil pump at issue, the court stated "[o]ne who puts as his own product a chattel manufactured by another is subject to ***the same liability*** as though he were its manufacturer."  *Id.* (quoting *Restatement (Second) of Torts*, § 400 (1965)) (emphasis supplied).  The court further explained that "this imposition of liability calls for the same result when the seller of a product is also an assembler of

its component parts, as the seller is, therefore, especially responsible for its defective condition when sold." *Id.* Applying that rule, the court flagged a key fact: "Hughes' liability stems not only from having incorporated a defective part into its helicopter, but also from its subsequent, undisputed knowledge of the defect." *Id.* Thus, under *Walton*, an assembler is, in fact, legally responsible for its participation in the supply chain, but something more (such as knowledge of the defect) is necessary to transform their conduct into something that merits treating their conduct as sufficiently "active" to deny them indemnity.

Applying these cases here, the court concludes that proper consideration of whether Flair must indemnify Signature requires resolution of various facts, including: whether Signature knew the icing packaging was defective; whether the way Signature assembled the product caused Plaintiffs' injuries; whether trade customs generally require the seller or manufacturer of such a product to ensure the cap is safely added; and whether the cap selected was tailored to the packaging, or whether Signature autonomously selected the cap at issue. Because none of these facts have been pleaded, the court cannot make the type of factual determinations necessary for it to decide whether Signature's conduct negates its entitlement to indemnification. *Hill v. Borough of Kutztown*, 455 F.3d 225, 232 n.7 (3d Cir. 2006) ("It would have been inappropriate for the District Court to decide the fact-intensive question in the context of a 12(b)(6) motion.").

Flair cites one case dismissing an indemnity claim on 12(b)(6), *Hawa v. Coatesville Area Sch. Dist.*, No. 15-4828, 2016 WL 4720968, at *2 (E.D. Pa. Sept. 9, 2016). But *Hawa* simply held a school district could not seek indemnification from its attorneys based on underlying civil rights violations, even if the attorneys advised them they could legally engage in the tortious conduct, because the school district still engaged in the conduct at issue, rendering them primarily liable. *Id.* This case does not prove a court can resolve, at the motion to dismiss stage, an indemnity claim between parties at different levels of a supply chain in a product liability case.

The court did locate a recent Middle District of Pennsylvania case granting a 12(b)(6) motion to dismiss third-party indemnification and contribution claims based on an underlying plaintiff's breach of warranty, negligence, and strict products liability claims. *See Musto v. Office Depot, Inc.*, No. 3:18-CV-02427, 2019 WL 2994230 (M.D. Pa. July 9, 2019). But that third-party plaintiff relied on thread-bare recitations of the indemnification and contribution elements, leaving the third-party complaint devoid of factual allegations explaining why the third-party defendant would have potentially been liable for the plaintiff's underlying allegations. *See id.* at *3. In contrast, the third-party complaint here alleges that Flair designed and manufactured the package at issue—two acts the Plaintiffs have repeatedly and extensively alleged caused their son's death. From these allegations, the court can

reasonably infer Flair is the primarily-liable party, with Signature being only secondarily-liable by operation of law, enabling a cognizable indemnification claim. The court will thus deny the motion to dismiss indemnification regarding the strict liability claims, including failure to warn and product liability.

### F. <u>The court will strike paragraph nineteen of Signature's third-party complaint, but grant Signature leave to re-plead.</u>

"Joint and several liability arises when there are joint tortfeasors." *LaZar v. RUR Indus., Inc.*, 487 A.2d 29, 32 (Pa. 1985). "Common law indemnity is not available to a joint tortfeasor." *Terra Servs., LLC*, 179 F. Supp. 3d at 495; *accord McCabe*, 77 A.2d at 370 ("In the case of concurrent or joint tortfeasors . . . no right of indemnity exists."). Thus, Signature improperly pleaded joint-and-several liability as being connected to its indemnification claim. (Doc. 19, ¶ 19.)

Signature nonetheless asserts, in its brief, that it was intending to allege joint-and-several liability to be established as a remedy to its contribution claim. *See, e.g.*, *Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 156 (3d Cir. 2001) ("Contribution applies when a plaintiff and defendant are joint tortfeasors."). Generally, "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile. . . even if the plaintiff does not seek leave to amend." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). Flair expressly states that it takes no position on whether joint-and-several liability could be properly connected to Signature's

contribution claim.  (*See* Doc. 26, pp.7-8.)   The court thus grants Signature leave to assert joint-and-several liability as part of its contribution claim.

## IV.  Conclusion

For the reasons described above, the court will grant the motion to dismiss in part, precluding Signature from seeking indemnification for Plaintiffs' underlying negligence and breach of express warranty claims.   The court will also grant the motion by striking paragraph nineteen of the third-party complaint.   The court will deny the motion on all other bases.   An appropriate order will follow.

*/s/ Sylvia H. Rambo*
SY[5]LVIA H. RAMBO
United States District Judge

Dated: October 1, 2019

---

[5]     It appears every party in this case has repeatedly misspelled the judge's name as "Silvia Rambo."  The court instructs the parties to correctly spell Judge Rambo's name in all future filings.